**HARMONY CONSTRUCTION, INC., a Delaware corporation, Plaintiff,**

v.

**STATE of Delaware DEPARTMENT OF TRANSPORTATION and Daisy Construction Co., Defendants.**

Civ. A. No. 14290.

Court of Chancery of Delaware, New Castle County.

Submitted: July 12, 1995.
Decided: July 21, 1995.

George H. Seitz, III and Patricia A. Pyles, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Plaintiff.

Frederick H. Schranck, Deputy Attorney General, Department of Justice, Dover, for Defendant State of Delaware Department of Transportation.

Donald L. Logan and John F. Thomas, of Tighe, Cottrell & Logan, P.A., Wilmington, for Defendant Daisy Construction Co.

JACOBS, Vice Chancellor.

Harmony Construction, Inc. ("Harmony") brought this action to enjoin the State of Delaware Department of Transportation ("DelDOT" or the "Department") from awarding and entering into a public works contract with Daisy Construction Company ("Daisy") on Public Contract No. 95–061–03 ("Contract 03"). On March 28, 1995, Harmony submitted a bid on Contract 03 of $1,104,049.66, which was the low bid. Daisy, the second lowest bidder, bid $1,154,721.08, or $50,671.42 more than Harmony. DelDOT decided to award the contract to Daisy, even though Harmony was the low bidder.

Upon learning that the contract would be awarded to Daisy, Harmony commenced this action in May, 1995. A trial on the merits of Harmony's application for final injunctive relief took place on July 5, 1995, and post-trial briefing was completed on July 12, 1995. This is the Opinion of the Court on the plaintiff's application for final injunctive relief.

## I.

Generally, a state agency is required to award a public works contract to the lowest responsible bidder, but that requirement is not absolute. By statute, a contract-awarding agency has discretion to award the contract to another bidder where:

in the opinion of the agency or its delegated representative, the interest of the State ... shall be better served by the awarding of the contract to some other vendor ... provided the agency shall set down in its minutes the reason or reasons for granting the contract to the person other than the lowest responsible vendor, and clearly describing how the interest of the State ... is better served by awarding the contract to other than the lowest vendor ...

29 *Del.C.* § 6907.

It is pursuant to that statutory authority that DelDOT determined not to award Contract 03 to Harmony. How that decision came about, and its underlying factual basis, were the subject of the trial and are at the heart of this controversy.

\* \* \*

On March 28, 1995, DelDOT publicly opened the bids received on Contract 03, and, as earlier noted, Harmony was the lowest responsible bidder. At that time Harmony was also the lowest responsible bidder on three other state highway contracts as well; namely, Contract No. 95–031–07 ("Contract 07"), Contract No. 95–031–08 ("Contract 08") and Contract No. 95–031–09 ("Contract 09"); and on April 4, 1995, Harmony also became the lowest responsible bidder on a fifth contract, Contract No. 93–096–11, SR 896 (New London Road) ("Contract 11").

Concerned about whether Harmony could perform all five contracts satisfactorily, DelDOT asked Harmony to meet with its representatives to discuss Harmony's status. On April 5, 1995, a meeting was held between representatives of Harmony and DelDOT. Harmony was represented by Messrs. William Saienni and William Saienni, Jr.

During or after that meeting, DelDOT requested Harmony to provide a work schedule illustrating how Harmony would proceed to perform all five contracts if they were awarded. DelDOT did not instruct Harmony to assume a specific start-up date for purposes of preparing the work schedule. DelDOT also asked Harmony to submit a payroll list of its employees; a list of equipment Harmony owned, including copies of certificates of title; and the names of the superintendents who would be assigned to each contract. Harmony provided that requested information to DelDOT on or about April 18, 1995, and the Department's engineers and other personnel then reviewed that information.

On May 2, 1995, Ms. Bobbi Hettel–Minner, and Messrs. Joseph Wright, Mark Alexander, James Lutzryzkowski, Sean Golt, and Frederick Schranck, Esquire, all DelDOT employees or attorneys (the "Departmental Committee"), met to discuss the awarding of contracts to Harmony. The Departmental Committee decided not to recommend awarding Contract 03, but did decide to recommend awarding the remaining contracts, to Harmony.[1]

The Department's reasons for not awarding Contract 03 to Harmony are recited in a May 3, 1995 memorandum written by Ms. Bobbi Hettel–Minner (DelDOT Contract Services Administrator) to Messrs. Ray Harbeson (DelDOT Director of Preconstruction) and Mike Angelo (DelDOT Contract Services Administrator). As that memorandum recites, the reasons for not awarding the contract to Harmony were that:

... 1. Harmony, by their own admission is a new company but is also made up primarily of the same individuals as Beaver Construction with the exception of one partner. The Department has no track record with Harmony Construction Company and a poor track record with Beaver Construction Co.

2. The contractor produced the following at the Department's request: a schedule showing how he would proceed with these 5 projects, if awarded, in a concur-

1. Contracts 08 and 09 were awarded to Harmony on May 3, 1995, and Contract 11 was award-  ed on May 4, 1995.

rent manner; a list of employees; a list of equipment owned by Harmony and the names of the superintendents that would be assigned to the projects. The schedule produced by the contractor was based upon a May 1st start date for 4 of the 5 projects which was an unreasonable assumption since the schedule was not submitted to the Department until 4–18–95. The contractors's [sic] proposed schedule was compared to the Departments [sic] schedule and it is felt that this Pave and Rehab project [Contract 03] causes a definite overlap of the contractors [sic] resources that would be unworkable. Therefore the committee felt that the scheduled [sic] was unrealistic. The committee felt that the contractor could execute the work on the 3 Suburban Street projects and the New London Road [Contract 11] based upon their schedule but that this Pave and Rehab was too much.

The contractor's equipment was listed under three different companies with the statement that the equipment would be made available to Harmony. The committee's concern firstly is that the two additional companies would be considered subcontractors and if the subs pulled the equipment the prime would be compromised.

The contractor has listed the same superintendent for both this project and for the New London road project [Contract 11]. The Pave and Rehab [Contract 03] has a majority of night work versus New London which is day work. It is not realistic to have the same superintendent on both projects due to the size of this Pave and Rehab. The superintendents on the two Suburban Streets are acceptable to the Department since they are smaller projects.

The trial evidence establishes that of these four stated reasons, only the second—that Harmony's proposed work schedule on all five contracts "would be unworkable" and that awarding Contract 03 would be "too much"—played a significant role in the Department's decision. The remaining reasons have little or no credible evidentiary support

and the Department has essentially disclaimed reliance upon them in this litigation.

The Department's first stated reason was that Harmony was a new company that had no track record and was made up of most of the same individuals as Beaver Construction Co., which had a "poor track record." Those concerns could not have been serious or significant to the Department's decision, because DelDOT chose to award the other four contracts to Harmony .despite those problems. Nor did the Department introduce any evidence establishing the basis or nature of Beaver Construction's alleged poor track record.

The Department's third stated reason was that the contractor's equipment was titled under two different companies (in addition to Harmony) that might "pull" the equipment and thereby "compromise" Harmony's ability to perform Contract 03. However, the undisputed trial evidence established that those two other companies were not independent firms but, rather, were owned by Mr. William Saienni, Jr., Harmony's President and controlling stockholder. For Mr. Saienni to cause his companies to withdraw equipment from the Contract 03 project, and thereby impede Harmony from performing a contract from which he would personally benefit, would be irrational. None of the trial witnesses explained why the Department supposed that Mr. Saienni, Jr. would choose to act in an economically self-destructive manner. At trial DelDOT's counsel indicated that the Department was not relying in any significant way on this justification for not awarding Contract 03 to Harmony.

The fourth justification recited in the May 3 Departmental memorandum was the concern that the same person would be acting as superintendent on both Contract 03 and Contract 11. That, the Departmental Committee concluded, was unrealistic because the former contract involved night work while the latter involved day work. That concern was shown to be without factual basis. In fact, there would be two different superintendents—Mr. Saienni, Sr. and Mr. Saienni, Jr.—on these contracts. The Department incorrectly concluded otherwise because the information Harmony submitted to DelDOT

inadvertently failed to distinguish clearly between these two gentlemen (both named Saienni), and DelDOT did not ask Harmony to clarify that point.

■ Thus, the predominate, if not sole, basis upon which the Department now rests its decision not to award the contract to Harmony is the conclusion of its engineers that the start-up dates that Harmony assumed in preparing its work schedule were unrealistic. Having so concluded, the DelDOT engineers then assumed different (and, in their view, more realistic) start-up dates. Using their own assumed start-up dates, the engineers then developed a work schedule different from that submitted by Harmony. From that new work schedule—which was never shared with Harmony—the Department concluded that there would be "overlaps" between certain of the contracts [2] that would prevent Harmony from being able to perform Contract 03 satisfactorily.

It is undisputed that the Department (i) did not advise Harmony what start-up dates to assume in preparing its work schedule, (ii) did not advise Harmony before making its contract-awarding decision of its engineers' conclusion that Harmony's assumed start-up dates were unrealistic, and (iii) did not afford Harmony an opportunity to submit a revised work schedule based on the Department's different start-up date assumptions, or, alternatively, to demonstrate that it (Harmony) could perform all five contracts based upon the Department's start-up dates. It also appears that the Department had not previously declined to award a contract to the low bidder on this ground, and that the Department did not have in place an established fact-finding process or procedure for determining not to award a contract to the lowest responsible bidder.

## II.

■ As earlier noted, the Department must normally award a public works contract to the lowest responsible bidder, but it is not required to do so if "in [the Department's] opinion . . . the interest of the State . . . shall be better served by . . . awarding . . . the contract to some other vendor." 29 *Del.C.* § 6907.[3] That discretion, however, is not unbridled. The law is clear, and both sides agree, that the Department may not exercise its discretion arbitrarily or capriciously. *W. Paynter Sharp & Son, Inc. v. Heller,* Del. Ch., 280 A.2d 748 (1971); *Liberto v. Villard,* La.App., 386 So.2d 930 (1980).

These principles generate two separate issues. The first is whether the Department's determination that Harmony had, in effect, "bit off more than it could chew" was one that the Department was legally authorized to make under § 6907. The second is whether in arriving at that determination, the Department acted arbitrarily or capriciously.

With the first issue I have no difficulty. Clearly it would disserve the interests of the State to award a contract to a contractor, even if it were the low bidder, that would be unable to perform the work satisfactorily be-

---

**2.** Meaning that the same manpower and equipment would have to be used on two different contract projects at the same time.

**3.** Because of its importance to the issue presented, § 6907 is set out in full text as follows:

The bids shall be publicly opened at the time and place specified and the contract shall be awarded within 30 days thereafter by the agency or a representative delegated by the agency, except that in the case of a public school district and its board the contract shall be awarded within 60 days thereafter, in accordance with regulations prescribed by the agency, to the lowest responsible vendor unless, in the opinion of the agency or its delegated representative, the interest of the State or the contracting county shall be better served by the awarding of the contract to some other vendor, which may then be done, provided the agency shall set down in its minutes the reason or reasons for granting the contract to the person other than the lowest responsible vendor, and clearly describing how the interest of the State or the contracting county shall be better served by awarding the contract to other than the lowest vendor. In determining how the interest of the State or contracting county is better served in making an award to other than the lowest responsible vendor, the agency make [sic] take into consideration unsatisfactory performances on any previously awarded contract by the vendor being rejected. If 2 or more responsible vendors shall bid an equal amount and such amount shall be the lowest bid, the agency or its delegated representative may award the contract to any 1 of them. The agency or its delegated representative may reject all bids.

cause of other contract commitments. That proposition would appear self-evident, but it is also supported by § 6907, which provides that "[i]n determining how the interest of the State ... is better served in making an award to other than the lowest responsible vendor, the agency may take into consideration unsatisfactory performance on any previously awarded contract by the vendor being rejected." Thus, from a purely legal standpoint, the rationale for the Department's decision is valid and Harmony does not contend otherwise.

Where the parties diverge is on the second issue, namely, whether the Department acted arbitrarily or capriciously in concluding that Harmony would be unable to perform Contract 03 satisfactorily if awarded all five contracts. That issue is more problematic because it is factual in nature and requires the Court to scrutinize the Department's decision-making process.

The Department contends that its determination must be upheld so long as there is *some* evidence to support it, and only in the absence of *any* supporting evidence can its determination be set aside as arbitrary and capricious. In this case, the Department claims, the testimony of its engineers (which facially is credible), and the absence of any evidence that the Department was not acting in good faith, support the Department's decision and comfortably satisfy that standard.

Harmony's contrary argument proceeds from an entirely different premise. Harmony contends that the Department's view of the arbitrary and capricious standard is too narrow, because this Court's review cannot be confined to scrutinizing the adequacy of the evidence supporting the Department's conclusion, but also must take into account the fairness and adequacy of the process by which the facts and evidence were obtained. Here, Harmony argues, the "evidence" supporting the challenged decision is essentially the opinion of Departmental personnel, which, in turn, rests entirely upon start-up dates that those persons assumed but never communicated to Harmony. That process, by its nature, deprived Harmony of any opportunity to respond to the Department's concerns, and more specifically, to demon-

strate its ability to perform Contract 03 based upon the Department's assumed start-up dates. Had that opportunity been afforded, Harmony claims, it would have demonstrated its capability to perform all five contracts satisfactorily. Therefore, Harmony concludes, the Department's determination, although concededly supported by "some" evidence, merits no deference because it was based upon a flawed decision-making process that precluded inquiry into other material facts that, if disclosed, would have demonstrated the error of—or at least have cast serious doubt upon—the Departmental engineers' conclusion.

I conclude, for the following reasons, that Harmony's position is correct.

■ The case law addressing the "arbitrary and capricious" standard contemplates that the scope of judicial inquiry is not limited to the adequacy of the evidence considered by the decision-making agency. The inquiry may also include the adequacy of the process by which the relevant evidence and facts were obtained. If the law were otherwise, an agency could rely solely upon selected facts or evidence that would support one particular outcome while at the same time blinding itself—or refusing to inquire into—material facts or evidence that might compel an opposite outcome. That approach, if countenanced, would be the essence of arbitrariness.

As this Court has stated in *Willdel Realty v. New Castle County*, Del.Ch., 270 A.2d 174, 178 (1970):

> 'Arbitrary and capricious' is usually ascribed to action which is unreasonable or irrational, or in that which is unconsidered or which is wilful and not the result of a winnowing or sifting process. It means action taken without consideration of and in disregard of the facts and circumstances of the case....

Consistent with that concept, courts in other jurisdictions have held, in cases addressing the arbitrary and capricious standard in the competitive bidding field, that an agency decision based upon "ignorance through lack of inquiry" is arbitrary and capricious. *International Telecommunications Systems v.*

*State,* Ala.Supr., 359 So.2d 364, 367 (1978); *see also Advance Tank and Constr. Co. v. Arab Water Works,* 910 F.2d 761, 765, n. 10 (11th Cir.1990).

This is not to suggest that the Department's position is devoid of all merit or force, but only that it misapprehends the scope of the "arbitrary and capricious" standard of review. That standard clearly is deferential, and its function is similar to that performed by the business judgment standard for reviewing decisions of corporate boards of directors. The purpose of both review standards is to prevent "second guessing" by courts of decisions that properly fall within the competence of a governmental (or corporate) decision-making body, so long as those decisions rest upon sufficient evidence and are made in good faith, disinterestedly, and with appropriate due care. It is also the case, as DelDOT argues, that no basis has been shown to question the Department's good faith, and that the evidence adduced to support the Department's decision—if viewed in isolation and without regard to the contrary evidence or the adequacy of the Department's fact-gathering process—technically would suffice to sustain the decision. In these circumstances, however, good faith and technically sufficient evidentiary support are not enough.

Implicit in the deferential "arbitrary and capricious" standard of review is the premise that the agency has employed a decision-making process rationally designed to uncover and address the available facts and evidence that bear materially upon the issue being decided. Indeed, it would seem that any decision made without such a process would be arbitrary by definition. In this case, the Department had no established rules or procedures to guide the conduct of its employees or contractors such as Harmony in making a determination of this kind, and the *ad hoc* procedure DelDOT did employ was highly flawed.

The deficiency of the Department's fact-gathering process is demonstrated by its result. In the May 3, 1995 memorandum, Department personnel recited four reasons to justify the decision not to award Contract 03 to Harmony. All but one of those reasons were shown to be either factually wrong or without evidentiary support, and the Department has for all intents and purposes disclaimed reliance upon them. That alone tends to undermine confidence in the adequacy of the fact-gathering and decision-making process used here.

DelDOT responds that even if three of its four justifications were not adequate, the fourth reason was, and on that basis alone its decision must be sustained. DelDOT adds that there was nothing unfair or flawed about its fact-gathering process, because (i) Harmony was afforded a full opportunity in early April to submit information demonstrating its ability to perform Contract 03, (ii) the fact that Harmony was not told what start-up dates to assume is not significant because Harmony's principals (Messrs. Saienni, Sr. and Saienni, Jr.) were highly experienced and knowledgeable of DelDOT's contract bidding and awarding procedures, and were fully capable of choosing realistic start-up dates, (iii) therefore, DelDOT cannot be faulted for any failure on Harmony's part to choose realistic start-up dates, and (iv) to require the Department to afford Harmony yet another chance to demonstrate facts that it could have but did not submit in the first place, would be unreasonable.

In other circumstances that argument might have merit, but not here. Had the Department and the bidders been operating under established procedures or rules known to all the parties concerned, then it would not be inappropriate to penalize a noncomplying bidder. But here there were no established rules. Rather, the Department made the rules up as it went along, never told Harmony what they were, and only after the game was over was Harmony told that it had flunked. Both the underlying legislative purpose and the factual record preclude any deference being given to a decision arrived at in this fashion. "The primary purpose of statutes governing bidding on public works is to protect public funds.... That purpose is best served when the public contract is awarded to the lowest responsible bidder." *Delaware Tech. & Com. Col. v. C & D Contractors, Inc.,* Del.Supr., 338 A.2d 568, 569 (1975) (citations omitted). If an agency de-

cides to deviate from that purpose, it must satisfy the Court that its determination not to award the contract to the lowest responsible bidder was the product of a rational fact gathering and decision-making process.

That showing cannot be made here, because the process utilized by the Department involved *not* communicating the rules to a bidder that was expected nonetheless to comply with them. Such a process was not rationally calculated to develop and address the material facts. As a result it created a significant risk that the Department would reach an incorrect conclusion, as evidenced by the fact that the Department's own assumed start-up dates turned out to be no more (and in one case was less) realistic than the start-up dates assumed by Harmony.[4] Moreover, the trial evidence established that if afforded the opportunity to address the Department's concerns relating to Harmony's start-up dates, Harmony would have supplied information responsive to those concerns.

\* \* \*

This Court will not normally or lightly decline to defer to a contract-awarding decision made by DelDOT. Given the broad discretion conferred upon the agency by § 6907, and the highly deferential nature of the applicable judicial review standard, only in extraordinary cases would this Court be justified in setting aside such a decision. Regrettably, this is such a case.

For the foregoing reasons, the Department's decision to award Contract 03 to Daisy Construction Co. will be set aside. Counsel shall submit an appropriate form of order, on notice, enjoining the award of that contract to Daisy.

[4]

| Project | Harmony's Assumed Start-Up Date | DelDOT's Assumed Start-Up Date | Actual Start-Up Date |
|---|---|---|---|
| Contract 04 | 5/1 | 6/1 | 5/8 |
| Contract 09 | 5/15 | 6/1 | 5/13 |

| | | | |
|---|---|---|---|
| Contract 11 | 5/1 | 6/15 | 7/10 |
| Contract 03 | 5/1 | 6/1 | — |