**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

December 13, 2021

Michael P. Kelly, Esquire
Andrew S. Dupre, Esquire
Travis Ferguson, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor
Wilmington, DE 19801

Daniel B. Rath, Esquire
Rebecca L. Butcher, Esquire
Jennifer L. Cree, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801

Patricia A. Davis, Esquire
Lawrence W. Lewis, Esquire
Zi-Xiang Shen, Esquire
Delaware Department of Justice
820 North French Street, 6th Floor
Wilmington, DE 19801

Re:  *Express Scripts, Inc. v. Del. State Empl. Benefits Comm.*,
C.A. No. 2021-0434-KSJM

Dear Counsel:

This letter resolves the plaintiff's motion for summary judgment. Plaintiff Express Scripts, Inc. ("ESI") filed this action alleging that the Defendant State Employee Benefits Committee (the "SEBC") violated the Procurement Statute when awarding the contract for the State of Delaware's Pharmacy Benefit Manager ("PBM").

On June 23, 2021, I denied ESI's motion to preliminarily enjoin the transition to the successful bidder, Defendant CaremarkPCS Health, L.L.C. ("CVS"). In a bench ruling, I found that ESI was likely to succeed on aspects of its claim, and assumed for the sake of analysis that ESI would face irreparable harm, but concluded that the balance of equities required denying the preliminary injunction. When balancing the equities, I observed that

a preliminary injunction threatened harm to over 129,000 members served by the contract and could result in a potential disruption of pharmacy benefits. This letter decision assumes that the reader is familiar with the June 23, 2021 bench ruling (the "PI Ruling").[1]

At the conclusion of the PI Ruling, I invited ESI to seek an interlocutory appeal. ESI instead moved for summary judgment on its claim for a permanent injunction. The standard applied at the preliminary injunction phase is more favorable to the movant than the standard applied on a motion for summary judgment. The former requires a reasonable probability of success on the merits. The latter requires actual success on the merits based on undisputed facts.

This begs the question: What has changed since the preliminary injunction phase to justify granting ESI, under a more onerous standard, that which it was denied before? The short answer is: not much. The factual record is largely the same because the parties opted to forego discovery after the preliminary injunction phase. Nor have the legal arguments changed significantly.

The only meaningful difference lies in ESI's requested relief. Before, ESI sought to preliminarily enjoin the transition to CVS for the Commercial population, which was to occur by July 1, 2021. Now, ESI seeks a court-ordered reevaluation of proposals, ideally before July 1, 2022, when the second year of the CVS contract takes effect. ESI argues

---

[1] *See* C.A. No. 2021-0434-KSJM Docket ("Dkt.") 61.

that it has met the standard for achieving what, in its view, is a more modest request for relief.

In my view, ESI's motion falls short again. The pared back relief still brings with it potential for disruption and confusion in a service that thousands of Delawareans depend on daily. Further, while ESI may be able to show that there were deficiencies in the PBM procurement process, ESI has failed to show that those deficiencies were material to the selection process. This decision therefore denies ESI's motion for summary judgment.

The SEBC and CVS have cross-moved for summary judgment. Those motions are held in abeyance pending supplemental briefing on the effects of this decision on the defendants' motions.

## I.     FACTUAL BACKGROUND

The facts are drawn from the materials submitted in support of the cross motions for summary judgment.[2]  As discussed above, the parties opted to forego additional factual discovery after the preliminary injunction phase, so the facts before the court now are nearly the same as they were in June 2021. The only additions to the record are two declarations explaining efforts undertaken to implement the PBM contract since the preliminary injunction phase. The first was a supplemental declaration from Faith Rentz, the Director of the Delaware Statewide Benefits Office ("SBO"), which coordinates the

---

[2] Dkt. 52, Pl.'s Hr'g Ex. List (by "PX").

procurement of employee benefits on behalf of SEBC.[3]  The second is the declaration of

Michelle Manolovic, CVS's Vice President for Business Development, Government and

Labor.[4]

Although it is true that "factual conclusions reached in a preliminary injunction

proceeding" are "tentative" and "it is open to the court to further consider factual matters

thereafter,"[5] because the main part of the factual record is no further developed than it was

at the preliminary injunction hearing, the main part of my factual findings has not changed.

What follows largely tracks the factual background set forth in the PI Ruling.[6]

A.      Structure of the State Employee Benefits Committee.

The SEBC is a statutorily authorized body comprising elected or appointed officials

or their designees formed to carry out the mission of the State's Group Health Insurance

Plan ("GHIP").[7]

Among its responsibilities, the SEBC selects "all carriers or third-party

administrators necessary to provide coverages to State employees."[8]  Relevant to this

---

[3] Dkt. 70, Decl. of Faith L. Rentz, dated Aug. 27, 2021 ("Supp. Rentz Decl.").

[4] Dkt. 72, Decl. of  Michelle A. Manolovic, dated Aug. 30, 2021.

[5] *Braunchsweiger v. Am. Home Shield Corp.*, 1991 WL 3920, at *1 (Del. Ch. Jan. 7, 1991).

[6] *See* PI Ruling at 3:21–15:10.

[7] 29 *Del. C.* § 9602(a).  In addition to eight specified elected or appointed officials, the statute requires the Governor to appoint a labor union representative to the SEBC.

[8] 29 *Del. C.* § 9602(b)(2).

dispute, the SEBC is responsible for procuring service contracts with PBM providers for the State's health insurance program.

PBMs occupy a unique niche in the healthcare ecosystem. Although PBMs' primary role is to administrate prescription drug programs for health insurance plans,[9] PBMs also operate as brokers between payers, drug manufacturers, and pharmacies.[10] PBMs earn revenues from client fees for processing claims, rebate savings resulting from negotiations with drug manufacturers, and "fees and shared savings from the maintenance of pharmacy networks."[11]

When this litigation was filed, ESI was the incumbent PBM for the State's GHIP.[12] The GHIP includes two different population segments: "Commercial," comprising approximately 102,000 non-Medicare members, and "Employee Group Waiver Plan" (or "EGWP"), comprising approximately 27,000 Medicare Part D beneficiaries.[13]

ESI's contract for the Commercial segment expired on June 30, 2021.[14] Its contract for the EGWP segment will expire on December 31, 2021.[15]

---

[9] Cole Werble, *Pharmacy Benefit Managers*, Health Affairs, Sept. 14, 2017, at 1, https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/healthpolicybrief_178.pdf.

[10] *Id.*

[11] *Id.*

[12] Dkt. 44, Decl. of Faith L. Rentz, dated June 14, 2021 ("Rentz Decl.") ¶¶ 7–8.

[13] Supp. Rentz Decl. ¶ 12.

[14] Rentz Decl. ¶ 8.

[15] *Id.*

### B. SEBC Requests Proposals for a New PBM Contract.

With the terms of the PBM contracts expiring in 2021, the SBO began planning the PBM procurement process in early 2020.[16] The SBO engaged the consulting firm Willis Towers Watson ("WTW") to help manage and evaluate bids.[17]

On June 1, 2020, the SBO publicly announced and posted the Request for Proposal for PBM services (the "RFP").[18] The Procurement Statute governs the process by which the state selects professional services contracts.[19] Under Section 6981(f), the SEBC is required to "establish written administrative procedures for the evaluation of applicants."[20]

The RFP established those procedures, setting out a two-phase process and stating that "[a]ll proposals shall be evaluated using the same criteria and scoring process."[21] Based on bidders' weighted scores in Phase I, finalists would move on to Phase II for consideration.[22]

In Phase I, bidders were required to state their ability to meet twenty-six "minimum requirements" that spoke to the bidders' experience and skill in performing the PBM contract, as well as their willingness to comply with key contractual and legal

---

[16] *Id.* ¶ 10.

[17] *Id.* ¶ 11.

[18] *See generally* PX-1.

[19] 29 *Del. C.* §§ 6980–6988.

[20] 29 *Del. C.* § 6981(f).

[21] PX-1 at 8–11.

[22] *Id.* at 4, 7–10.

requirements.[23]  For each requirement, the bidder was required to check either the box indicating that it "confirmed" its compliance with the minimum requirement or the box stating, "not confirmed, explain."[24]

The RFP disclosed that a bidder's inability to confirm all the questions as written would not necessarily prevent a bidder from proceeding.[25]  Because the State's intent in a procurement "is to have as many qualified bidders in [the] process as possible," the goal of Phase I "was not to exclude or narrow the list of bidders who would continue on with this process."[26]

Phase I responses were due by Wednesday, June 17, 2020.[27]

In Phase II, the SEBC focused on a financial and qualitative evaluation of the finalists' bids, assigning weight to the following criteria:  Responsiveness, 5%, Cost, 50%, Organization's Ability and Experience, 20%, Network and Formulary, 15%, and Administrative Services, 10%.[28]  The Phase II questionnaire was extensive—ESI's

---

[23] *Id.* at 25–30.

[24] *Id.*

[25] *Id.* at 24 ("Failure to meet any minimum requirements *may* result in disqualification of the proposal submitted by your organization.") (emphasis added).

[26] PX-27 ("Rentz Dep. Tr.") at 47:20–48:1; Dkt. 69, Ex. A at DDHR_00012383 (discussing at a meeting between the SBO and OMB's Government Support Services whether the RFP should include "some true drop-dead mins for a 'weed-out.'"); Rentz Dep. Tr. at 61:4–9 (testifying that the SBO did not consider whether failure to meet any minimum requirements was disqualifying because, "[the RFP] say[s] *may* not *shall* be disqualified").

[27] PX-1 at 3.

[28] *Id.* at 10.

response was 293 pages and CVS's response was 317 pages.[29] The bid scores took into account "the bid information WTW provides, the information in the interviews [with bidders], and the apples-to-apples pricing."[30] The standards ranged from the PBM's qualifications and technical abilities, to what performance guarantees it agreed to give to the State, and the clinical programs offered, among several other categories.[31] Bidders were also required to complete spreadsheets that detailed the offerors' proposed pricing, the drug formulary they proposed, and the disruption posed by the offerors' proposed retail pharmacy network.[32]

Phase II opened on July 6, 2020, and responses were due by August 7, 2020.[33]

The SEBC established a Proposal Review Committee ("PRC") to review the proposals submitted in Phase I and Phase II.[34] Each member of the SEBC selected a representative to serve on the PRC.[35] The PRC was tasked with recommending a winning bidder to the SEBC, which would have the final and sole authority to award the PBM contracts.[36]

---

[29] PX-5; PX-26.

[30] Dkt. 70, Ex. B at DDHR-00011965.

[31] *See, e.g.*, PX-5.

[32] *Id.*

[33] PX-29 at 5–6.

[34] PX-1 at 8.

[35] *Id.*

[36] *Id.* at 9; 29 *Del. C.* § 5256(3).

Six initial offerors responded to the RFP.[37] Five made it past Phase I.[38] Those five included ESI and CVS.[39]

### C. SEBC Awards the PBM Contract to CVS.

ESI received a letter on December 15, 2020, stating that the SEBC voted to award the PBM contracts to CVS.[40] The transition to CVS would occur on July 1, 2021, for the Commercial segment[41] and on January 1, 2022, for the EGWP segment.[42]

The letter specified that CVS's proposal offered savings of 21.8% over a three-year period when compared with ESI's current contract.[43] It further highlighted six additional factors that informed the SEBC's decision to award the contract to CVS. Those factors included: minimal disruption in transitioning from the status quo, ability to administer plan requirements in compliance with Delaware law, superior account management, and superior customer and implementation services.[44]

---

[37] Rentz Dep. Tr. at 49:1.

[38] Rentz Decl. ¶ 17.

[39] *Id.* ¶ 18.

[40] PX-19.

[41] Rentz Decl. ¶ 8.

[42] *Id.*

[43] PX-19.

[44] *Id.*

The scoring by the PRC revealed that ten of the twelve PRC members ranked ESI second after CVS in their Commercial scoring.[45] The other two ranked ESI first overall.[46] In the EGWP scoring, eleven of the twelve PRC members ranked ESI second after CVS and one ranked ESI first.[47] In the scoring summary, which combined the scores of all PRC members, ESI again ranked second after CVS.[48] Where CVS received an overall score of approximately 146, ESI scored approximately 132.[49]

On December 17, 2020, two days after being notified of the SEBC's decision, ESI submitted a Freedom of Information Act ("FOIA") request to obtain the documents necessary to evaluate the selection process.[50] On December 23, 2020, ESI formally protested the SEBC's decision to award the contract to CVS.[51]

On January 5, 2021, the SEBC denied ESI's FOIA request on the grounds that ESI lacked Delaware citizenship.[52] ESI corrected and re-filed its request the following day.[53] On February 12, 2021, the SEBC provided ESI with documents responsive to its FOIA

---

[45] PX-9 at 3.

[46] *Id.*

[47] *Id.* at 4.

[48] *Id.* at 2.

[49] *Id.*

[50] PX-22 at 1.

[51] *See generally* PX-22.

[52] Dkt. 1, Ex. G at 1.

[53] *Id.*

request.[54]   The records were redacted.[55]   ESI requested unredacted records, which the

SEBC denied.[56] ESI then filed a supplemental protest of the SEBC's decision on February

19, 2021.[57]

On April 12, 2021, the SEBC issued a final decision in which it rejected ESI's

protest.[58]

### D.    ESI Files This Lawsuit.

ESI filed this lawsuit on May 17, 2021, asserting two causes of action.[59]

In Count I, ESI claims that the SEBC's evaluation process violated the requirements

contained in the Procurement Statute.[60]   ESI also claimed that the SEBC improperly

redacted documents turned over in response to the FOIA request, but SEBC did not press

this claim in briefing or oral argument and has thus abandoned the claim.

In Count II, ESI seeks an injunction either "disqualifying CVS and permanently

enjoining the SEBC from awarding or entering into a formal contract with CVS" or

---

[54] *Id.* at 2.

[55] PX-23 at 1.

[56] *Id.*

[57] *See generally* PX-23.

[58] PX-24 at 16.

[59] Dkt. 1, Verified Compl. for Injunctive and Declaratory Relief ("Compl.").

[60] Compl. ¶¶ 39–84.

"ordering the SEBC to re-evaluate the proposals in accordance with the RFP and its mandatory minimum requirements."[61]

CVS was not named as a defendant initially. The SEBC took the position that CVS was a necessary party.[62] I then permitted ESI to join CVS as a party and later allowed a third-party bidder to intervene for the limited purpose of protecting the confidentiality of its information.[63]

### E. The Court Denies ESI's Motion for a Preliminary Injunction.

With the amended complaint, ESI moved for a preliminary injunction to stave off the July 1, 2021 transition to CVS as the PBM for the Commercial segment.[64] The parties engaged in expedited discovery and briefing on ESI's motion for a preliminary injunction.[65] The SEBC produced thousands of pages of documents and ESI took the depositions of SBO Director Faith Rentz and PRC Member Steven Costantino.[66]

---

[61] *Id.* at 37.

[62] Dkt. 60, Tr. of the May 20, 2021 Telephonic Rulings of the Court on Pl.'s Mot. to Expedite at 10:6–9.

[63] Dkt. 12, First Am. Verified Compl. for Injunctive and Declaratory Relief ("Am. Compl."); Dkt. 38.

[64] Am. Compl. ¶¶ 100–07.

[65] Dkt 41.

[66] Rentz Dep. Tr.; PX-28.

The standard applicable to a motion for a preliminary injunction required the court to assess whether ESI demonstrated a reasonable probability of success on the merits.[67] In running this analysis, I focused on whether the SEBC exercised its discretion in an arbitrary or capricious manner when awarding the PBM contract.[68] I found that it was reasonably probable that ESI would succeed on aspects of its arguments.[69] I questioned, however, whether any of the arbitrary and capricious actions were material in the sense that they would have altered the outcome of the process.[70]

I ultimately made a plaintiff-friendly presumption, concluding that ESI had "[eked] past the requirement that it be reasonably likely to succeed" on the merits.[71] I next assumed "[f]or the sake of analysis only" that ESI had established irreparable harm.[72] I then denied the motion on the ground that that the harm to the public and GHIP members from a disruptive injunction during the PBM transition, resulting in customer confusion and

---

[67] *See* PI Ruling at 15:12–20; *Protech Sols., Inc. v. Del. Dep't of Health and Hum. Servs.*, 2017 WL 5903357, at *1 (Del. Ch. Nov. 30, 2017).

[68] PI Ruling at 17:15–20:20.

[69] *Id.* at 48:5–9.

[70] *Id.* at 47:20–48:5 ("In candor, it's unclear to me to what degree the odd variability in [scoring] would support injunctive relief, standing alone. It seems that the primary utility of the scorecard was to create a ranking system. That system, and the rankings, might not have been altered, despite the subjective translation of objective metrics like cost and despite the failure to fully credit the incumbent. It's unclear.").

[71] *Id.* at 50:4–6.

[72] *Id.* at 49:19–24.

risking members not receiving medications, outweighed any harm to ESI from its

unsuccessful bid.[73]

###### F.  Delaware Continues Transitioning to CVS.

At the conclusion of the PI Ruling, I observed that the ruling would be appropriate

to certify for interlocutory appeal.[74]  ESI did not move to certify an interlocutory appeal of

---

[73] *Id.* at 50–53.  When balancing the equities on a motion for preliminary injunction, this court must consider the potential harm of an injunction to persons with a legitimate interest in the matter, including the public.  *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02[f] (2d ed. 2020) ("Generally speaking, the balancing of the equities analysis entails a determination whether the harm that would result to the applicant if an injunction does not issue would outweigh the harm that will befall the opposing party (or others with a legitimate interest in the matter, including, in some instances, the public) if such relief is issued."); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 584 (Del. Ch. 1998) ("'[A] court of equity has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties.' Thus, in order to obtain preliminary injunctive relief, Plaintiff must prove that this Court's failure to grant the injunction will cause Plaintiff greater harm than granting the injunction will cause Defendants. It is also appropriate to *consider the impact an injunction will have on the public and on innocent third parties*." (emphasis added)); *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *6 (Del. Ch. Oct. 16, 1987) ("[Equitable relief] requires, first, that plaintiff persuade the court that he has a reasonable likelihood of prevailing on the merits of his complaint at trial. If that demonstration is made, the court is to inquire whether plaintiff is threatened with irreparable injury before a final hearing may be had and, finally, to balance against that threat, the harm that may befall the defendant (or *others with a legitimate interest in the matter*) should the remedy be granted improvidently." (emphasis added)).

[74] PI Ruling at 57:22–58:11 ("Given the issues at stake, I imagine that Express Scripts is considering an interlocutory appeal.  Anticipating that, I have reviewed the factors of Delaware Supreme Court Rule 42, and I believe that my ruling decides a substantial issue of material importance, addresses issues of first impression, and relates to an issue of public importance such that the considerations of justice would be served by an interlocutory appeal.  For these reasons, I would certify an interlocutory appeal, should Express Scripts seek leave to pursue one.  I have also asked our court reporter to prepare an expedited copy of the transcript of this ruling.").

the PI Ruling. Consequently, the SBO transitioned the Commercial population to CVS, implementing various member supports in the process. For example, the SBO implemented "Safety Protocols" to ensure members can continue to obtain critical medications during the transition period.[75] These protocols enable the CVS Customer Care Team to authorize one-time exception refills of "life sustaining" medications that members require within 72 hours of the requested refill.[76] In addition to implementing member supports, the SBO established design and review changes for the PBM Plan, including correcting prescription maximum fill discrepancies, updating prior authorizations and coverage, and implementing a prescription savings plus program for non-covered drugs.[77] On July 1, 2021, CVS became the PBM for the Commercial segment.[78]

The SBO also began planning for the January 1, 2022 transition to CVS for the EGWP population.[79] Although the EGWP population is smaller than the Commercial population, it is a higher-need group.[80] The average age of an EGWP member is 74.6 years old, compared to 35.1 years old for Commercial members.[81] Nearly all EGWP members

---

[75] Supp. Rentz. Decl. ¶ 6.

[76] *Id.*

[77] *Id.* ¶ 7.

[78] *Id.* ¶ 4.

[79] *Id.* ¶ 10.

[80] *Id.* ¶ 12.

[81] *Id.*

(92.4%) use the prescription drug benefit, compared to 72.2% of Commercial members.[82]

And on average, EGWP have 2.28 prescriptions per month, compared to an average of less than one for Commercial members.[83]

In the months leading up to the January 1, 2022 transition, the SEBC has been coordinating a Fall Medicare Open Enrollment, creating eligibility files and an enrollment process, reviewing the CVS reporting process, creating a communications strategy tailored to the EGWP population, and coordinating with the Delaware Office of Pensions to ensure compliance with internal enrollment and finance reporting processes, among other things.[84]

### G.     The Parties Cross-Move for Summary Judgment.

ESI moved for summary judgment pursuant to Court of Chancery Rule 56 on July 16, 2021.[85]  In response, both the SEBC and CVS cross-moved for summary judgment on August 30, 2021.[86]  The parties fully briefed their respective motions and the court held oral argument on November 16, 2021.[87]

ESI's request for relief has shifted over the course of this litigation.  On its motion for a preliminary injunction, ESI sought to prevent the State from transitioning the

---

[82] *Id.*

[83] *Id.*

[84] *Id.* ¶ 10.

[85] Dkt. 63, Opening Br. in Support of Pl. Express Scripts, Inc.'s Mot. for Summ. J. ("Pl.'s Opening Br.").

[86] Dkt. 67; Dkt. 71.

[87] Dkt. 85 ("Oral Arg. Tr.").

Commercial population to CVS on July 1, 2021.[88] In Count II of the Complaint, ESI sought an injunction *either* "disqualifying CVS and permanently enjoining the SEBC from awarding or entering into a formal contract with CVS" *or* "ordering the SEBC to re-evaluate the proposals in accordance with the RFP and its mandatory minimum requirements."[89] In its opening brief in support of its motion for summary judgment, ESI requested that the court rule on the motion in time to enjoin the December 31 transition.[90] The parties then stipulated to hold argument on November 16, 2021. By the time of oral argument, ESI sought only an order requiring the SEBC to reevaluate the proposals on a timeline established by the court.[91]

## II.    LEGAL ANALYSIS

The cross motions seek summary judgment on both Counts of ESI's Complaint. Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[92] Generally, "the court must view the evidence in the light most favorable to the non-moving party."[93] But where, as here,

---

[88] PI Ruling at 14:14–19.

[89] Am. Compl. at 37.

[90] Pl.'s Opening Br. at 50 (arguing that "[w]ith respect to the EGWP contract, ESI is the current PBM provider until December 31, and a potential ruling on this motion can be issued prior to that time.").

[91] *See* Oral Arg. Tr. at 6:9–7:1.

[92] Ct. Ch. R. 56(c).

[93] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted).

the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[94]

"There is no 'right' to a summary judgment."[95] The court may, in its discretion, deny cross motions for summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.[96]

---

[94] Ct. Ch. R. 56(h).

[95] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (quoting *Anglin v. Bergold*, 565 A.2d 279 (Del. 1989)).

[96] *See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) (reversing summary judgment holding where there was a triable issue of material fact and commenting that "the trial court may . . . deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.") (citation omitted); *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918–19 (Del. 1965) (holding that in denying the defendant's motion for summary judgment, the trial court "needed no more reason than to conclude, upon preliminary examinations of the facts, that it found it desirable to inquire thoroughly into all of the facts in order to clarify the application of the law"); *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962) (reversing summary judgment holding where a genuine issue of disputed fact remained unresolved and observing that summary judgment will not be granted "if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances") (citation omitted); *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCMR, at 10 ¶ 11 (Del. Ch. Oct. 31, 2016) (ORDER) (denying summary judgment where "fuller development of the facts should serve to clarify the law or help the Court determine its application to the case").

### A. Count I

In Count I, ESI claims that the SEBC violated the Procurement Statute by awarding the PBM contracts to CVS.[97]

When evaluating a claim that an agency violated the Procurement Statute, the court first assesses whether the agency complied with the statutory requirements. If the agency complied with the statutory requirements, the court then determines whether the agency exercised its discretion in an appropriate manner.[98]

In this case, ESI does not argue that the SEBC failed to comply with the minimal statutory requirements when awarding the PBM contract.[99] Instead, ESI argues that the SEBC abused its discretion when awarding the PBM contract to CVS.

---

[97] Am. Compl. ¶ 41.

[98] *See Doctors Pathology Servs. P.A. v. State Div. of Pub. Health, Dep't of Health & Soc. Servs.*, 2009 WL 4043299, at *4 (Del. Ch. Nov. 20, 2009).

[99] The Procurement Statute differentiates between public works and professional services. *Compare* 29 *Del. C.* § 6902(23) (defining "Public works contract") *with* 29 *Del. C.* § 6902(20) (defining "Professional services"). The General Assembly granted the executive branch limited discretion in soliciting bids for and awarding public works contracts and broad discretion in soliciting bids for and awarding public service contracts. *Compare* 29 *Del. C.* §§ 6960–6970A (establishing mandatory procurement requirements for public works contracts) *with* 29 *Del. C.* §§ 6980–6988 (enumerating discretionary criteria that "may be utilized" in ranking applicants for professional services contracts). As to public service contracts, the only statutory requirements are that the agency "shall establish written administrative procedures for the evaluation of applicants" and the "administrative procedures shall be adopted and made available to the public by each agency before publicly announcing an occasion when professional services are required." 29 *Del. C.* § 6981(f); *see also Protech*, 2017 WL 5903357, at *3. The PBM contract was a contract for professional services. *See generally* PX-1. Thus, the only statutory requirements are the minimal obligations established by Section 6981(f). ESI does not claim that the SEBC failed to satisfy those requirements.

The purpose of the Procurement Statute is twofold, to:

> (1) Create a more efficient procurement process to better enable the State to obtain the highest quality goods, materials and services at the best possible price, thereby maximizing the purchasing value of public moneys; and

> (2) Create a single forum in which the procurement needs of state agencies and the technical and legal requirements of the Government Support Services are addressed simultaneously so as to increase mutual understanding, respect, trust and fair and equitable treatment for all persons who deal with the state procurement process.[100]

Of these two purposes, the first is paramount. While the second purpose reflects a legislative intent to treat all persons, including bidders, in a "fair and equitable manner," this court has interpreted this language as subordinate to the first purpose when the challenge is brought by a disappointed bidder. This interpretive approach is intended to avoid enticing disappointed bidders into using litigation to obtain leverage in or otherwise taint the procurement process.[101]

---

[100] 29 *Del. C.* § 6901.

[101] *See Autotote Lottery Corp. v. Del. State Lottery Off.*, 1994 WL 163633, at *7 (Del. Ch. Apr. 22, 1994) ("To issue an injunction here would permit a disappointed bidder to deploy a statute that seeks to promote the public good so as to occasion delay and achieve private advantage. This would be a subversion of the statute."); *Gannett Co., Inc. v. State*, 1993 WL 19714, at *3 (Del. Ch. Jan. 11, 1993) ("The laws requiring that public contracts be awarded through competitive bidding are primarily intended for the protection of the public[.]"); *id.* at *6 (describing the "primary purpose of competitive bidding on public contracts" as "to avoid the waste of taxpayers' money"); *Doctors Pathology*, 2009 WL 4043299, at *7 & n.65 (observing that "the primary purpose of the competitiveness requirement is to prevent waste through favoritism") (cleaned up); *id.* at *7 ("Any discretionary procurement structure will tend to advantage certain bidders over others, and those disfavored bidders will invariably come up with arguments against its use. But that disagreement cannot give rise to something akin to a due process proceeding absent

Consistent with this hierarchy of purposes, Delaware courts have viewed challenges

under the Procurement Statute advanced by disappointed bidders with a healthy degree of

skepticism.[102]

---

evidence that the agency's decision was so patently unreasonable that it was likely the product of undue influence. Where a public agency is operating not as a regulator, but in its proprietary capacity, courts are obligated to tread particularly lightly."); *Asphalt Paving Sys., Inc. v. Dep't Transp.*, 2008 WL 852817, at *2 n.15 (Del. Ch. Mar. 20, 2008) (noting that "public bidding laws were adopted to avoid the waste of public funds, thereby serving to protect taxpayers."); *Edmonston v. Watson*, 1988 WL 32372, at *3 (Del. Ch. Mar. 31, 1988) ("Generally, the purpose of statutes regulating the bidding on public contracts is to protect the public interest."); *George & Lynch, Inc. v. Div. of Parks & Recreation, Dep't of Nat. Res. & Env't Control*, 465 A.2d 345, 350 (Del. 1983) (stating that the protection of public funds was a primary, but not exclusive, purpose of bidding statutes).

[102] *See, e.g.*, *George & Lynch, Inc.*, 465 A.2d at 352 (affirming this court's denial of disappointed bidder's challenge to an agency contract award because disappointed bidder failed to comply with statutory requirements for bid); *Doctors Pathology*, 2009 WL 4043299, at *4, *10 (dismissing a disappointed bidder's challenge to an agency's contract award and noting that when the "general guidelines [of the Procurement Statute] are met and in the absence of agency conduct that facially appears irrational, illegal, or tainted by undue influence or favoritism, a court's review of the solicitation process is extremely limited"); *Holley Enters., Inc. v. City of Wilm.*, 2009 WL 1743726, at *5 (Del. Ch. June 5, 2009) (denying a disappointed bidder's request for a TRO and holding that agency was reasonable in concluding that a criminal indictment disqualified the bidder as a "responsible bidder" because under Delaware law "agencies need only a rational factual basis for their decisions."); *Danvir Corp. v. City of Wilm.*, 2008 WL 4560903, at *7 (Del. Ch. Oct. 6, 2008) (entering summary judgment against a disappointed bidder and noting that the State is "vested with broad discretion in determining which applicant is the lowest responsible bidder in a particular case and such a decision will not be disturbed unless it can be shown to have been illegally or arbitrarily exercised"); *Asphalt Paving*, 2008 WL 852817, at *5 (granting summary judgment against a disappointed bidder because even if bid documents supplied by the State were misleading, the disappointed bidder failed to show they were actually misled); *Autotote Lottery*, 1994 WL 163633, at *7, *10 (granting summary judgment against a disappointed bidder and noting that "the state's business must be done"); *Delmarva Drilling Co., Inc. v. Kent Cty. Dep't of Cmty. Dev.*, 1988 WL 39968, at *2–3 (Del. Ch. Apr. 26, 1988) (dismissing a disappointed bidder's request for a preliminary injunction due to lack of standing, mootness, laches, and failure to join a necessary party); *Statewide Hi-Way Safety, Inc. v. Dep't of Transp.*, 1983 WL 18024, at *3

This judicial skepticism has manifested in two complimentary aspects of the legal standard applicable to claims challenging a state agency's exercise of discretion. When determining whether a state agency abused its discretion under the Procurement Statute, the court will only intervene if the agency exceeded the limits of its discretion where (i) the actions were "arbitrary and capricious"[103] and (ii) the violations were "material."[104]

This court has interpreted the arbitrary-and-capricious standard as highly deferential.[105] In *Willdel*, Chancellor Duffy described the arbitrary-and-capricious standard in the context of a challenge to a zoning ordinance as follows:

---

(Del. Ch. June 28, 1983) (denying a disappointed bidder's request for a TRO based on the merits and based on standing because "bid statutes are for the benefit of the taxpayers and others who would be adversely affected by the waste of public funds").

Although the parties did not raise this issue, Delaware courts are split on whether disappointed bidders have standing to sue in their capacity as bidders under the Procurement Statute. *See Asphalt Paving Sys.*, 2008 WL 852817, at *2 n.15 (holding that, "[a]s a general matter, under Delaware law, disappointed bidders lack standing to challenge an agency's award of a contract."); *Statewide Hi-Way Safety*, 1983 WL 18024, at *3 (same); *Delmarva Drilling Co.*, 1988 WL 39968, at *2 (holding that "one who is not a resident or not a taxpayer, but who sues only in the capacity of a disappointed low bidder, has no standing"); *but see Wahl v. City of Wilm.*, 1994 WL 13638, at *2 (Del. Ch. Jan. 10, 1994) (noting that granting standing to disappointed bidders is the better rule of law); *Danvir Corp.*, 2008 WL 4560903, at *4 (same).

[103] *See Doctors Pathology*, 2009 WL 4043299, at *5 ("Courts will only overturn the determinations of State agencies where those decisions are arbitrary, capricious, or in bad faith.").

[104] *Autotote Lottery*, 1994 WL 163633, at *7 ("[T]hus only where material breaches in the process are shown will a court intervene.").

[105] *See Protech*, 2017 WL 5903357, at *7 (holding that award of maintenance and operations contract was not an arbitrary and capricious exercise of power); *Doctors Pathology*, 2009 WL 4043299, at *6 (holding that award of laboratory services contract was not an arbitrary and capricious exercise of power); *Danvir Corp.*, 2008 WL 4560903,

> "Arbitrary and capricious" is usually ascribed to action which is unreasonable or irrational, or to that which is unconsidered or which is willful and not the result of a winnowing or sifting process. It means action taken without consideration of and in disregard of the facts and circumstances of the case. Action is also said to be arbitrary and capricious if it is whimsical or fickle, or not done according to reason; that is, it depends upon the will alone.[106]

In *Harmony Construction*, then-Vice Chancellor Jacobs had occasion to apply the above principles in the context of a challenge under the Procurement Statute. There, Harmony Construction, Inc. ("Harmony") submitted the lowest bid for a public works contract, but the Delaware Department of Transportation ("DelDOT") awarded the contract to the second lowest bidder.[107] DelDOT reasoned that as start-up entity, Harmony lacked the resources to complete the project on the contemplated timeline.[108] Harmony filed suit claiming that DelDOT violated the Procurement Statute by acting arbitrarily and capriciously in arriving at its determination.[109]

---

at *7 (holding that award of city towing contract was not an arbitrary and capricious exercise of power); *Willdel Realty, Inc. v. New Castle Cty.*, 270 A.2d 174, 179 (Del. Ch. 1970), aff'd, 281 A.2d 612 (Del. 1971) (holding that zoning ordinance was not an arbitrary and capricious exercise of power); *but see Harmony Const., Inc. v. State Dep't of Transp.*, 668 A.2d 746, 752 (Del. Ch. 1995) (holding that when an agency process deliberately fails to communicate rules to a bidder, despite requiring compliance with those rules, then it presents an extraordinary case where highly deferential arbitrary and capricious standard is satisfied).

[106] *Willdel Realty, Inc.*, 270 A.2d at 178.

[107] *Harmony Const.*, 668 A.2d at 746.

[108] *Id.* at 749.

[109] *Id.* at 749–50.

The Vice Chancellor held that DelDOT's decision not to award the contract to Harmony was arbitrary and capricious and enjoined the contract award to the second lowest bidder.[110] The court held that an agency's process is relevant to the judicial inquiry, and found that DelDOT had not established rules in its process, but rather, "made the rules up as it went along, never told Harmony what they were, and only after the game was over was Harmony told that it flunked."[111] Consequently, DelDOT's decision to shun the lowest bidder based on such a defective process was not "the product of rational fact gathering and decision-making process."[112]

Although the Vice Chancellor found in favor of the disappointed bidder, he simultaneously emphasized that

> [t]his Court will not normally or lightly decline to defer to a . . . decision made by [an agency]. Given the broad discretion conferred upon the agency . . . and the highly deferential nature of the applicable judicial review standard, only in extraordinary cases would this Court be justified in setting aside such a decision.[113]

Put differently, the arbitrary-and-capricious standard is "clearly . . . deferential, and its function is similar to that performed by the business judgment standard for reviewing

---

[110] *Id.* at 752.

[111] *Id.* at 751.

[112] *Id.* at 752.

[113] *Id.*; *see also Doctors Pathology*, 2009 WL 4043299, at *5 (describing *Harmony* as establishing a highly deferential standard of review that will justify a court "set[ting] aside [an agency's] contract based upon the inadequacy of the agency's decision-making process" in "exceptional" circumstances only).

decisions of corporate boards of directors."[114]  The standard serves to "prevent second guessing by courts of decisions that properly fall within the competence of a governmental . . . decision-making body, so long as those decisions rest upon sufficient evidence and are made in good faith, disinterestedly, and with appropriate due care."[115]

Second, a disappointed bidder must demonstrate that the alleged wrong was material.[116]  In *Autotote*, Chancellor Allen considered cross-motions for summary judgment on the State's decision to award a five-year contract to run the State Lottery Office.[117]  Although Autotote's bid was superior in many ways to the successful bidder, the Director of the State Lottery Office awarded the contract to the lowest bidder.[118]  The plaintiff argued that the State breached the Procurement Statute by failing to get concurrence that sealed bidding was impractical, disclose the relative weights of factors being considered, and allow bidders to negotiate after proposals were submitted.[119]

The Chancellor cautioned that "the purpose of the bidding laws is not to create a field over which disappointed vendors can [pore] for hope of upsetting a rational, informed

---

[114] *Harmony Const.*, 668 A.2d at 751.

[115] *Id.* (cleaned up); *see also Save Our Cty., Inc. v. New Castle Cty.*, 2013 WL 2664187, at *10 (Del. Ch. June 11, 2013); *Holley Enters.*, 2009 WL 1743726, at *3.

[116] *Autotote Lottery*, 1994 WL 163633, at *7.

[117] *Id.* at *1.

[118] *Id.*

[119] *Id.* at *7.

choice."[120]  To further this principle, the Chancellor announced a materiality threshold, holding that "[t]he state's business must be done and thus only where *material* breaches in the process are shown will a court intervene."[121]  Chancellor Allen denied the plaintiff's motion for summary judgment.  In reaching this conclusion, the Chancellor applied the materiality threshold, observing in part that the plaintiff had failed to demonstrate any injury for the imperfections it identified in the agency's process.[122]

To meet the doubly deferential standard in this case, ESI advances the same four points for why the SEBC abused its discretion that it advanced on its motion for a preliminary injunction.  First, the SEBC treated ESI unequally by imposing "incumbent vendor only" requirements.[123]  Second, the SEBC's scoring of a lack of disruption to the network and formulary factors did not fully credit the incumbent for this factor.[124]  Third, the SEBC's subjective evaluation of the objective cost factor lacked a rational basis.[125] Fourth, the SEBC treated bidders unequally by waiving, as to some, the Phase I minimum requirements.[126]

---

[120] *Id.*

[121] *Id.* (emphasis in original).

[122] *Id.*

[123] Pl.'s Opening Br. at 32–35.

[124] *Id.* at 38–41.

[125] *Id.* at 35–38.

[126] *Id.* at 41–46.

On the motion for a preliminary injunction, I found three of these arguments compelling and concluded that ESI was likely to succeed in proving that aspects of the SEBC's process were arbitrary and capricious.[127]

To summarize my prior findings, ESI presented evidence demonstrating that the incumbent-only requirements restricted ESI's ability to narrow its network and formulary, that other bidders were not so limited, and that a narrower network and formulary generally results in more competitive pricing. ESI also made a compelling argument that, because it did not alter its network and formulary, it should have achieved high marks for minimizing disruption to plan participants, but its scores on that factor seemed discounted. Similarly, ESI demonstrated that the SEBC acted arbitrarily by using a subjective system to rank an objectively quantifiable factor like cost.[128] Although I held that these aspects of the process were imperfect—and, indeed, arbitrary—in the end I questioned whether any of the process deficiencies were material.[129]

The record and arguments before me are the same as they were on the plaintiff's motion for a preliminary injunction. Unsurprisingly, my conclusions are the same. This decision does not repeat the entirety of my prior analysis. It suffices to say that, although ESI's arguments concerning various deficiencies in the SEBC's process continue to carry logical force, ESI has again failed to demonstrate that the conduct was material. For

---

[127] PI Ruling at 48:5–9.

[128] PI Ruling at 43:12–21.

[129] PI Ruling at 52:11–53:8.

example, would removing the incumbent-only requirements, accounting consistently for the lack of disruption in ESI's proposal, or standardizing the score cards on quantitative factors have altered the ranking system in a way that was dispositive to the determination? ESI has made no effort to meet this showing. The lack of any evidence concerning the materiality of the alleged violations forecloses summary judgment in favor of ESI on this issue.

Accordingly, ESI's motion for summary judgment as to Count I is DENIED.

## B. Count II

In Count II, ESI claims that success on the merits of Counts I entitles ESI to a permanent injunction, "ordering the SEBC to re-evaluate the proposals in accordance with the RFP and its mandatory minimum requirements."[130]

A permanent injunction "is an extraordinary form of relief."[131] The elements for permanent injunctive relief are: (1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm to the plaintiff that will result from a failure to enter an injunction outweighs the harm that befalls the defendants or other interested parties, such as the public, if an injunction is granted.[132] The elements are

---

[130] Am. Compl. at 37.

[131] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 384 (Del. 2014).

[132] *Sierra Club v. Del. Dep't of Nat. Res. & Envtl. Control*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006).

conjunctive, ESI's failure to satisfy any individual element defeats a request for a permanent injunction.

As discussed above, ESI has failed to demonstrate success on the merits of Count I, thus defeating the first element of its claim for a permanent injunction in Count II. ESI fails to prevail on its motion as to Count II for the additional reason that it has not demonstrated based on undisputed facts that the equities tilt in its favor.

As an initial matter, disrupting the transition to CVS would threaten the medical benefits of large segments of the State's population. I made this observation in the PI Ruling. The same is true now. Although most of the GHIP members have now switched to CVS, the EGWP segment has yet to transition. The EGWP segment is more vulnerable than the Commercial segment and has a substantially higher rate of utilization of the prescription drug benefit.[133] Disrupting the transition at this stage would bring harm to the EGWP population.

Recognizing this previously identified weakness in its argument, ESI modified its requested relief on summary judgment to seek a reevaluation of the bids. Specifically, ESI seeks reevaluation before July 1, 2022, when the second year of CVS's contract for the Commercial population takes effect.[134] Because the State must provide all plan documents, rates, and other information to benefit-eligible members no later than 60 days prior to the

---

[133] Supp. Rentz Decl. ¶ 12.

[134] Oral Arg. Tr. at 23:12–15.

start of the plan year,[135] ESI's requested relief would require the SEBC to complete its reevaluation before May 2022.

Even as modified, ESI's requested relief would impose some level of harm on the SEBC and the public. In the ordinary course, the overall time for a PBM procurement process from start to finish takes approximately six months followed by approximately three months of implementation work.[136] The process, which would begin in mid-December at the earliest, would have to be completed before the May 2022 open enrollment. Thus, the reevaluation process contemplated by ESI would be rushed. Any rebid of the PBM procurement would have to jockey with at least four other RFPs that the SBO must complete over the specified timeframe, including a procurement for a GHIP administrator which is described as a "larger scale than the PBM procurement."[137] Thus, the six-month procurement process would need to be shortened by 25% while being squeezed in between other planned projects. This timeline would be risky even under ideal conditions, and any failures in this process would be borne by plan members and the public. Even assuming that a new procurement was practicable on this timeline, an abrupt change from CVS to ESI so close to the open enrollment could disrupt members' benefits.[138]

---

[135] Supp. Rentz Decl. ¶ 19.

[136] *Id.* ¶ 20.

[137] *Id.* ¶¶ 14–17.

[138] *Id.* ¶ 21.

In the alternative, ESI argues for a reevaluation before January 2023, when the second year of the EGWP contract takes effect.[139] Although this timeline mitigates some of the harms identified above, it does not eliminate such harm entirely. The SEBC would still have to conduct the reevaluation atop of its normally scheduled duties. Plan members would still be exposed to some harm in having to navigate a premature transition from CVS to ESI in the event the reevaluation favors ESI. Certainly, the harm to CVS becomes more severe under this scenario since CVS would have labored under the Commercial contract for nearly a year and a half at the time of the reevaluation.

While the harm to the public and stakeholders is lower in ESI's alternative scenario, the harm to ESI is also lower. In the ordinary course, the next procurement will begin in June 2023.[140] It is hard to conceive of how ESI would experience irreparable harm if I decline to require the SEBC to act six months earlier—in January 2023.

For these reasons, ESI has not met its burden of demonstrating that the equities tilt it its favor, even on a more leisurely 2023 timeline.

Accordingly, ESI's motion for summary judgment as to Count II is DENIED.

III.  CONCLUSION

ESI's motion for summary judgment is denied. Does it automatically follow that the Defendants' cross-motions for summary judgment must be granted? The parties did

---

[139] Oral Arg. Tr. 28:12–20.

[140] *See* Rentz Decl. ¶ 14, 24.

not develop this issue in briefing. They are granted leave to make supplemental submissions concerning the effect of the findings in this decision on Defendants' cross-motion for summary judgment.

Sincerely,

*/s/ Kathaleen St. J. McCormick*

Kathaleen St. J. McCormick
Chancellor

cc:     Counsel of record (by e-filing)